UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID R. CAUDILL,
    Plaintiff,

Civil Action No. 1:13-cv-017
Weber, J.
Litkovitz, M.J.

vs.

THE HARTFORD LIFE AND
ACCIDENT INSURANCE CO.,
    Defendant.

**REPORT AND
RECOMMENDATION**


This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§ 1001, *et seq*. ("ERISA"). Plaintiff brings this action under 29 U.S.C. § 1132 against Hartford

Life and Accident Insurance Company ("Hartford"), seeking to recover long-term disability

(LTD) benefits under the terms of his employer-sponsored group benefits plan. This matter is

before the Court on the parties' cross-motions for judgment on the administrative record (Docs.

15, 16), and their respective opposing memoranda (Docs. 19, 20).

## I. FACTUAL BACKGROUND

### A. Plaintiff's employment history

Plaintiff began his employment with Sunoco, Inc. (Sunoco) at its chemical plant in

Haverhill, Ohio, in 1996. (AR 132).[1] His last day of work was May 8, 2011. (AR 135). On that

date, plaintiff was working as a Phenol 3 Operator (AR 126), also referred to as a "Chief Board

Operator No. 1" (AR 137) and a "chemical operator" (AR 193). Plaintiff's general

---

[1] "AR" refers to the Administrative Record filed in this case (Doc. 14), and the numbers following the "AR"
designation are the last three digits of the cited page number.

responsibilities were operating pumps, compressors and other devices used to regulate the

pumping and processing of hazardous chemicals. Plaintiff was required to work three to seven

days per week, and 12 to 18 hours per day. (AR 126). He was also scheduled to work 12 to 36

hours of overtime per week. (*Id*.).

The components of plaintiff's job are described in three separate documents: a "Physical

Demands Analysis" (AR 126-27); a "Phenol 3 Operator Job Description" (AR 128-29); and a

"basic work description" supplied by plaintiff's supervisor, Paul Brian Lodwick (AR 193).

According to the job descriptions in the record, plaintiff's job required the mental acuity to

"[m]ake quick precise adjustments and decisions," "monitor[] hundreds of control loops,"

"[t]roubleshoot . . . and assist in resolution of abnormal situations, alarms, and emergencies," and

"handle multiple task[s] simultaneously." (AR 193). The job description information further

specifies that "[e]ach emergency situation involves a rapid response, in the form of shutting

valves, clearing lines, and/or restarting pumps and equipment." (AR 129). According to the

work description supplied by Mr. Lodwick, persons performing plaintiff's job are "[g]reatly

responsible for the health and safety of others" and "[e]rrors could cause serious safety problems

in the plant or for other workers." (AR 193). The physical demands of plaintiff's job included

the ability to use manual and power hand tools and a calculator, telephone, and computer. (AR

126). Plaintiff was required to drive a fork lift (*Id*.), work in high places (AR 193), climb ladders

and stairs (AR 128), "[s]tand for long period[s] of time depending on the work being done," and

"[r]eact quickly using hands, arms, fingers, [and] feet." (AR 193). A typical workday required

him to sit up to 5 hours, stand up to 4 hours, and walk up to 3 hours (AR 126); push, pull, carry

and lift up to 50 pounds (AR 127); and frequently balance, stoop, kneel, crouch, climb, reach,

handle, finger and feel (*Id*.). The job involved exposure to extreme cold, wet/humid conditions,

2

fumes/dust/dirt/smoke, confined areas, high places, moving equipment, safety

equipment/clothing, noise, and mechanical, chemical and electrical hazards. (AR 127, 193).

**B. The LTD Plan**

By virtue of his employment with Sunoco, plaintiff elected to participate in Sunoco's

group long-term disability plan, Group Insurance Policy Number GLT 302811 (the Plan). The

Plan was issued by Hartford to Sunoco. The Plan provides for the payment of a monthly benefit

if: (1) an employee becomes "Disabled" while insured under the Plan; (2) the employee is

disabled throughout a 180-day "Elimination Period"; (3) the employee remains disabled for the

first 24 months following the Elimination Period; (4) the employee is under the regular care of a

physician during the Elimination Period; and (5) the employee submits proof of loss satisfactory

to the insurer. (AR 7, 19). The Plan defines "Disabled" to mean that during the Elimination

Period, and for the 24 months following the Elimination Period, the covered employee is

"prevented from performing one or more of the Essential Duties of Your Occupation[.]"[2] (AR

19). The "Disability" must be the result of accidental bodily injury, sickness, mental illness,

substance abuse, or pregnancy. (AR 19). The Plan defines "Elimination Period" as "the longer

of 180 consecutive days at the beginning of any one period of Disability which must elapse

before benefits are payable or the expiration of any Employer unused vacation, paid holidays, or

floating holidays, excluding benefits required by state law." (AR 5). "Your Occupation" is

defined as "the specific job you are performing for a specific employer at a specific location."

(AR 22). "Essential Duty" means "a duty that: 1. is substantial, not incidental; 2. is fundamental

or inherent to the job; and 3. can not be reasonably omitted or changed." (AR 20). The Plan

authorizes Hartford to require an individual who claims disability benefits to submit to a medical

examination at Hartford's request. (AR 6).

---

[2] There are also earnings requirements that are not at issue here. (AR 19).

### C. Plaintiff's pre-application medical history

On May 9, 2011, the day after he stopped working (AR 135), plaintiff saw his primary health care provider, Jennifer L. Atkins, PA-C,[3] complaining of "generalized body aches." (AR 227-30). Plaintiff initially complained to Ms. Atkins about malaise, fatigue, chest pain, nervousness, and anxiety. (AR 227-28). Ms. Atkins' treatment notes reflect that plaintiff complained of increased stress at work, including 12-hour shifts on a daily basis for some time, in turn causing increased pain "all over." (AR 227). Plaintiff reported to PA Atkins he worked up to 72 hours a week. When he took a couple of days off work, the pain improved. He stated that his generalized body aches were a chronic problem which had grown worse over the past four to five years and that his symptoms, including chest pain, were aggravated by work stress. He also reported that he was worried he was going to react to work stress in a "bad way" or that work was going to break him down physically. (Id.). An EKG showed sinus bradycardia with no acute ST changes. (AR 230). PA Atkins diagnosed plaintiff with elevated blood pressure, chest pain, and anxiety. (AR 228). She increased plaintiff's dosage of Lexapro, added Buspar for anxiety, and arranged for a stress test. (AR 229).

PA Atkins completed a Health Care Provider Certification on which she reported to Sunoco that plaintiff had been referred to a cardiologist due to an abnormal stress test and that he had chest pain, elevated blood pressure, and increased stress and anxiety "often precipitated by work." (AR 188-89). She noted that he was working long hours with little rest and that his symptoms continued to worsen. (AR 189). PA Atkins certified that plaintiff was "unable to climb, lift, or do excessive manual labor [due to symptoms] worsened [with] exertion (chest pain, elevated [blood pressure])," and that he should not return to his current tasks and work environment until his symptoms improved. (Id.).

---

[3] Ms. Atkins is a certified physician's assistant.

4

Plaintiff consulted with Dr. Zane Darnell, M.D., for a cardiac evaluation on May 17, 2011. (AR 250-52). He complained of high blood pressure, shortness of breath, leg swelling, fatigue and chest pain aggravated by emotional upset. (AR 250-51). His blood pressure was 144/95. His physical examination was normal. (AR 252). Plaintiff underwent a stress test that showed a possible anterior wall reversible ischemia which required clinical correlation. (AR 253). A chest x-ray was negative. (AR 246). Dr. Darnell prescribed medication for the high blood pressure. (AR 252). A left heart cath procedure, coronary angiograpy and left ventriculography conducted a few days later revealed no abnormal findings. (AR 243-45).

Plaintiff visited PA Atkins on May 25, 2011. (AR 231-33). Plaintiff reported that he had been told his arteries were clear and looked good. (AR 231). Plaintiff reported a new problem of daily anxiety, and while he felt better since starting on the increased dosage of Lexapro, he still felt drained and had no energy. (*Id*.). Plaintiff reported associated symptoms of recurring chest pain, although the problem had been gradually improving, and headaches. The symptoms were aggravated by stress. (AR 231). His musculoskeletal pain had improved. (*Id*.). The review of systems was positive for malaise/fatigue, and plaintiff was reported to be nervous/anxious. (AR 231). His physical examination was normal and his blood pressure was 126/82. (AR 231-232). PA Atkins diagnosed plaintiff with chest pain, fatigue and anxiety. (AR 232). She ordered a blood test, directed plaintiff to continue with his medications and follow up with Dr. Darnell, and released him to return to work. (AR 232-33).

Before allowing him to return to work, plaintiff's employer required him to consult with Dr. Paula Larsen, M.D., a specialist in occupational medicine. (AR 103, 219). Plaintiff was evaluated by Dr. Larsen on May 26, 2011. (AR 219). Plaintiff told Dr. Larsen that he had anxiety with symptoms of sweating, feeling clammy, lightheadedness and general fatigue. (*Id*.).

5

He was "very anxious" about returning to work because things had changed, there was a smaller work force, and he "just [didn't] feel safe because a lot of people have left." (*Id*.). Dr. Larsen concluded that plaintiff was experiencing panic attacks and depression, probably associated with the death of his son in 2005 in addition to his work load. (*Id*.). Her medical opinion was that he should be evaluated and treated by a psychiatrist for his condition prior to being released back to work and that his psychiatric condition could be contributing to his high blood pressure and feeling of fatigue. (*Id*.). Plaintiff was agreeable to Dr. Larsen setting up an appointment for him, and in the meantime she reported that she would not release him to return to work until she received a note from plaintiff's treating medical doctor. (*Id*.). Dr. Larsen informed Sunoco that plaintiff was "not cleared to return to work until further evaluation by a specialist M.D. and then [follow-up] in occupational medicine." (AR 217).

Plaintiff underwent an initial psychiatric evaluation with Dr. Lana Davenport, M.D., in June 2011. (AR 211-12). She diagnosed plaintiff as suffering from an anxiety disorder NOS and a depressive disorder NOS with further evaluation needed to rule out panic disorder and obsessive compulsive disorder. (AR 212). Dr. Davenport identified sources as both occupational and the death of plaintiff's stepson. (*Id*.). She assigned a GAF score of 45.[4] Her recommendations were that plaintiff continue on Lexapro, start therapy, and consider the addition of Xanax in the future. (*Id*.). Dr. Davenport advised Sunoco by letter to its representative Kim Schwab dated June 30, 2011, as follows:

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social and occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "'serious'" symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id*.

> David R. Caudill was first seen by myself on June 27, 2011 and is currently being treated for anxiety and depression, much of which appears to be work related due to occupational stressors. Our next scheduled appointment is July 7, 2011. At the present time, in my opinion, Mr. Caudill is not able to return to work until further notice.

(AR 216). A postscript to the letter read: "July 11, 2011[:] There have been no changes to patient at this time . . . and he is still not able to work until further notice." (*Id*.).

On follow-up with Dr. Darnell on July 27, 2011, the review of symptoms was positive for fatigue and shortness of breath. (AR 247-48). Dr. Darnell reported that plaintiff was continuing to take Lexapro and Buspar and his blood pressure was much improved with Zestoretic. (AR 248-49). He noted that plaintiff was tired but slept easily. (AR 249). Plaintiff's physical examination was normal. (AR 248-49).

Plaintiff saw a mental health counselor for an initial evaluation on June 9, 2011 (AR 119) and an additional six times for counseling between July 11, 2011 and August 29, 2011. (AR 120-125). Plaintiff complained at the initial evaluation of physical complaints including muscle stiffness, stomach pain, and joint pain related to stress. (AR 119). Plaintiff's mood was oriented and his affect was appropriate. (*Id*.). On July 25, 2011, plaintiff reported continued anxiety related to work involving tensing up and he discussed worries over safety issues at work, but he felt that his current medications were working. (AR 123). He reported on August 1, 2011, that he thought his medicine was working and he was "not getting as flared up." (AR 122). On August 8, 2011, he reported some elbow, arm and knee pain, some sleep issues, and some continued stressors after a recent conversation with a former co-worker. (AR 121). He relayed to his therapist that he had decreased his medications as instructed by Dr. Davenport but felt like he might have to go back to the higher dose. (*Id*.). On August 29, 2011, he described restless sleep where he kicked at night and reported that he "broke out in a cold sweat for no reason" two

7

or three times, but he reported an improved relationship with the administration at work, an improved mood, and an increased sense of relaxation. (AR 120). At all of the therapy sessions, plaintiff was noted to be oriented and alert, his affect and appearance were appropriate, and his psychomotor presentation was appropriate. No perceptual disturbances were noted or related. He denied suicidal or homicidal ideations. (AR 120-25).

### D. Plaintiff's LTD application

Plaintiff applied for LTD benefits on September 16, 2011. (AR 135-41). He listed his last day of work as May 8, 2011, and his most recent occupation as Chief Board Operator No. 1. (AR 135, 137). Plaintiff reported symptoms of nervousness, irritability, fatigue, memory loss, body aches, tiredness, joint inflammation, blackouts, and high blood pressure. (AR 137). Plaintiff stated that he first noticed his symptoms in approximately 2005 and that they had worsened over time, causing physical problems. (*Id.*). Plaintiff stated that stress had made long work hours difficult and nervousness had affected his decision making prior to the date he stopped working. (AR 138). He identified fatigue, physical pain, nervousness, panic attacks, and severely high blood pressure as aspects of his condition that made him unable to work. (*Id.*). Plaintiff indicated that his condition was related to his occupation and specifically to "increased occupational stress, safety fears of plant operation." (*Id.*). Plaintiff listed two physicians he had seen for his condition: Dr. Larsen and Dr. Davenport. (*Id.*).

Dr. Davenport submitted an Attending Physician's Statement (APS) dated September 7, 2011, indicating that plaintiff had been seen every four weeks beginning June 27, 2011. (AR 142-43). She listed diagnoses of anxiety disorder NOS, depressive disorder NOS, and "occupational problem." (AR 142). She noted subjective symptoms of anxiety, depressed mood, decreased energy, feelings of dread and worthlessness, and restlessness. (*Id.*). Current medications were Buspar and Lexapro. (*Id.*). She indicated that plaintiff had made trips to the emergency room and urgent care for

8

increased blood pressure, chest pain and shortness of breath, all of which were found to be due to his anxiety. (*Id.*). She described plaintiff's psychiatric impairment as "pervasive anxiety [and] depression caused initially by the death of his stepson in 2005, made worse by increasing occupational stressors over the past year [and] a half." (AR 143). She described his progress as "improved." (*Id.*). She stated that she had "advised [plaintiff] to take additional time off work until his anxiety [and] depression have resolved." (*Id.*). She wrote that the expected duration of any current restrictions or limitations was undetermined as of that point. (AR 143). In the "Functional Capabilities" section of the assessment, she wrote "not applicable" and did not mark any restrictions, stating that she is a psychiatrist and she was treating plaintiff for mental health problems. (*Id.*).

### E. Hartford's file review/claim denial

Hartford Ability Analyst Sarah Herseth conducted a file review in plaintiff's case. (AR 42). She contacted Drs. Larsen and Davenport in September 2011 and asked them to submit medical records and complete APS's for Mental Health Claims (APS-MHS). (AR 42). Dr. Larsen's office advised Hartford that any requests for medical records should be made to plaintiff's attending physician. (AR 99). Ms. Herseth contacted plaintiff's primary care provider, PA Atkins. PA Atkins stated that she was unable to complete an APS because she had last seen plaintiff in May 2011, and he had since been seeing Dr. Davenport for mental health issues. (AR 100). PA Atkins reported that plaintiff was to have followed up with Dr. Darnell in July of 2011. (*Id.*). Ms. Herseth made two requests for records from Dr. Darnell prior to mid-November 2011. (AR 94-95).

In addition to seeking these records, on October 12, 2011, Ms. Herseth interviewed plaintiff, who stated he had been referred to Dr. Larsen by his employer and he had seen her only one time. (AR 103). Plaintiff also identified Jerry Morris as his counselor with Dr. Davenport's office. (*Id.*). Plaintiff reported that he had weakness and pain associated with depression and

9

feelings of "nervousness and being scared while at work thinking something was going to happen in regards to safety." (AR 107). Plaintiff stated he had two to three hours of functionality throughout the day and he spent most of the day lying down. (*Id*.). Plaintiff reported that he did not have a physical disability and that his "physical pain is all related to stress." (AR 103).

Dr. Davenport submitted an APS-MHC dated October 10, 2011. (AR 113-15). Dr. Davenport diagnosed plaintiff with depression and adjustment disorder with anxiety and depressed mood and depressive disorder NOS. (AR 113). She assigned plaintiff a GAF score of 60.[5] (*Id*.). She stated that plaintiff had stopped working due to severe anxiety and depression, explaining that work was very stressful for plaintiff and he had never dealt with the emotional fallout related to his stepson's death in 2005. (AR 114). A mental status examination on August 29, 2011 was "normal" and showed that plaintiff was well-groomed and cooperative with normal speech, a logical/coherent thought process, good insight into his illness, psychomotor activity within normal limits, and intact attention, concentration and memory. (AR 113, 115). Dr. Davenport stated: "He is much better than when I originally saw him in 6/11. He has mostly returned to baseline functioning. . . . At [the] time of his most recent visit he stated he felt much better [and] presented with a normal mental status exam." (AR 114-15). Dr. Davenport opined that plaintiff "could have a trial back at work at most any time. I wouldn't be surprised if he decompensated in the work setting, however." (AR 115).

Ms. Herseth reviewed the medical records from Dr. Davenport and the APS she had completed on October 10, 2011 (AR 113-15). (AR 104-105). Ms. Herseth noted that she would need an update of plaintiff's last office visit with Dr. Davenport. (AR 105). Ms. Herseth contacted Dr. Davenport's office to obtain an update about plaintiff's last scheduled office visit on October 10, 2011. (*Id*.). On October 13, 2011, Ms. Herseth spoke with an individual from Dr.

---

[5] The DSM-IV, p. 34, categorizes individuals with scores of 51-60 as having "moderate" symptoms.

Davenport's office who advised her that plaintiff's current mental status examination remained

unchanged between his August 29, 2011 office visit and his most recent office visit. (AR 102-03).

Ms. Herseth subsequently received and reviewed Dr. Davenport's office notes from plaintiff's

October 10, 2011 office visit. (AR 102). Those notes stated that plaintiff continued to take Lexapro,

which Dr. Davenport was going to decrease to see if it helped with plaintiff's libido, and Buspar.

(AR 241). Dr. Davenport noted that plaintiff was alert, oriented, cooperative, friendly and easily

engageable with a full affect and mildly anxious mood. (*Id*.). The notes also stated:

> Anxiety better. Doing more things. Still quite "weak and tired" during the day, has
> to take frequent naps, but overall feeling better. . . . Approached him about a trial
> back at work and he seems hesitant about that. I agree that my opinion was that much
> of his presenting anxiety seemed work related, and I truly doubt that he would
> tolerate a trial at work. Warned him that his disability policy may require him to do
> just that, though. He feels one of the biggest limiting factors as far as going back to
> work is his ability to maintain a full 8 hour working day due to his weakness. Is not
> having any more panic attacks.

(*Id*.).

Dr. Davenport submitted a letter to Hartford by fax on November 8, 2011, in which she

stated that she had seen plaintiff that day and that he was "currently being treated for anxiety and

depression, much of which appears to be work related due to occupational stressors. . . . At the

present time, in my opinion, Mr. Caudill is not able to return to work until further notice." (AR 234).

Hartford Behavioral Health Case Manager Shea Rawlings reviewed plaintiff's claim on

November 9, 2011. (AR 94). She sent a letter that same date to Dr. Davenport noting her October

10, 2011 findings and asking (1) whether plaintiff had been released to return to work, and (2) if

plaintiff had not been released to return to work, what psychiatric limitations were associated with

his current condition in light of Dr. Davenport's October 10, 2011 APS documenting mental exam

status findings within normal limits and a return to baseline functioning for the most part. (AR 236-

37). In response, Dr. Davenport wrote as follows:

This letter is in response to your most recent inquiry about David R. Caudill, who has been a good, reliable and frequent patient of mine since 6/27/2011. I have seen him a total of 7 times. . . .

You state that in my 10/10/2011 note, Mr. Caudill's mental status seemed to be within normal limits, and that he has mostly returned to baseline status. In the subjective part of my note, however, I refer to Mr. Caudill's continued problems with weakness and tiredness, his need to take frequent naps, and his dwindling sex drive. I also commented about his anxiety and depression being mostly work related, and that he would probably not tolerate a trial back at work. I refer to his inability to sustain a full 8 hour working day. Did you read that part of the note? I am sending it to you again so that you can take a closer look at it.

I am also enclosing a more recent note dated 11/8/2011 in which his mental status seemed to have deteriorated and he was discussing his worsening physical status. I started a workup for autoimmune disorders at this time.

No, I have not released him to go back to work. I believe I have made it clear in many of my notes that I feel that Mr. Caudill's anxiety and depression was in large part related to occupational stressors, and that the reason he has improved is because he's been able to get away from his job. This would logically imply that if he returned to work, he would most likely deteriorate again. This has been my opinion all along, and will not change. I have not been unclear about this in any way. . . .

(AR 238-39).

Dr. Davenport stated in the November 8, 2011 treatment note referenced in her letter that plaintiff was having "a lot of physical problems: weakness, joint aches and pains, joint swelling, general malaise." (AR 240).[6] She ordered tests to rule out an autoimmune disorder and other possible physical disorders. (*Id.*). She noted that plaintiff's sex drive was a little better and the results of his mental status evaluation were normal, except that his "[m]ood [was] a little down[.]" (*Id.*).

Ms. Rawlings completed her review of the claim on November 16, 2011. (AR 90-91). She determined that Dr. Davenport had documented mental status examination findings within normal limits and that much of plaintiff's anxiety seemed to be work-related, and Dr. Davenport documented on the APS that plaintiff appeared to be at baseline and his status was improved.

---

[6] Plaintiff represents, and Hartford does not dispute, that the undated treatment note found at AR 240 is the November 8, 2011 note referenced in Dr. Davenport's letter. (Doc. 16 at 8) (Document page numbers cited in the Report and Recommendation are the ecf page numbers).

Ms. Rawlings concluded: "Global severity of impairment is not supported from a psychiatric standpoint based on review of medical from Dr. Davenport currently in claim file." (AR 91).

Ms. Herseth evaluated plaintiff's claim in November 2011. (AR 82-90). She summarized the medical information in the file, including records provided by Dr. Darnell which she found reported no ongoing cardiac issues and mentioned no work limitations. (AR 86). She noted Ms. Rawlings' conclusion concerning plaintiff's mental health. (*Id*.). She concluded that the medical information in plaintiff's file did not support his inability to perform his own occupation from either a physical or a psychiatric standpoint. (*Id*.).

On November 30, 2011, before a final determination was made on plaintiff's claim, an Occupational Analysis Report was completed by Rehabilitation Case Manager Wayne Blake. (AR 81-82). He found the essential duties and corresponding physical demands, environmental conditions and non-exertional requirements of plaintiff's Phenol 3 Operator to be comparable to the Chemical Operator II position listed in the Dictionary of Occupational Titles (D.O.T.), which was performed at the medium level of exertion. (AR 81).

On December 8, 2011, Hartford Manager Meghan Palmer reviewed the file and agreed with Ms. Herseth's recommendation to deny plaintiff's claim. (AR 81). Ms. Palmer found that plaintiff appeared to be off work due to his psychological impairment and that physical symptoms he complained about appeared to be related to his anxiety; however, the medical evidence from Dr. Davenport did not confirm a "Global severity of impairment . . . from a psychiatric standpoint"; plaintiff's mental examination was within normal limits; and the APS completed by Dr. Davenport showed that plaintiff had improved. (*Id*.).

Based on its review, Hartford sent a letter through Ms. Herseth to plaintiff dated December 9, 2011, advising plaintiff that Hartford had determined he did not meet the definition

13

of disability because he was capable of performing the essential duties of his occupation and

benefits were not payable.  (AR 48-52).

**F. Plaintiff's claim appeal**

Plaintiff submitted an appeal of Hartford's decision on July 2, 2012.  (AR 194-99).  In

support of his appeal, plaintiff provided Dr. Davenport's notes from a December 1, 2011 office

visit.  (AR 213).  The notes stated that plaintiff was "[s]till hurting, still [without] energy, still

with very low level of endurance"; numerous lab studies to rule out lupus or other autoimmune

disorders had all been negative; he continued on Lexapro and Buspar; he had not had an

appointment with his therapist, Mr. Morris, in a while; and he was alert, oriented, and

cooperative with a depressed and anxious mood and constricted and congruent affect.  His

diagnoses were anxiety disorder NOS, depressive disorder NOS, rule out depression and anxiety

secondary to a medical disorder, and financial and occupational stressors.  (*Id*.).  Dr. Davenport

indicated that plaintiff planned on scheduling an appointment with a rheumatologist soon.  (*Id*.).

Plaintiff had subsequently seen a rheumatologist, Dr. Kimberly England, D.O., on

December 15, 2011, for complaints of right elbow swelling and "multiple joint pain[s]."  (AR

205-06).  On examination, Dr. England found "18/18 fibromyalgia tender points."  (AR 206).

Dr. England reported that the range of motion of plaintiff's upper and lower extremities was

restricted due to pain, but the degree of restriction was not reported.  She reported no other

positive findings.  Plaintiff's erythrocyte sentimentation rate (ESR) was documented as 15, and

previous antinuclear antibody (ANA) and rheumatoid factor tests were reported to have been

negative.  Dr. England diagnosed plaintiff with shortness of breath, arthritis and fibromyalgia

and prescribed treatment.  (AR 206).  She ordered a pulmonary function test because of his

report of shortness of breath.  (*Id*.).

14

Dr. England completed an APS on January 9, 2012. (AR 186-87). She made a primary diagnosis of arthritis and a secondary diagnosis of fibromyalgia. (AR 186). Plaintiff's current subjective symptoms were "pain in all joints," stiffness, and shortness of breath. (AR 186). The only current physical examination finding was "18/18 fibromyalgia tender points." (*Id.*). Plaintiff was being treated with medication. In the section for marking work restrictions, Dr. England wrote "N/A." (AR 187).

Dr. England treated plaintiff in February 2012 for the flu. (Tr. 203-04). Plaintiff complained of feeling achy with a fever. He reported he had been sleeping better and his pain was improved, but he still had difficulty grasping objects. (AR 203). Dr. England prescribed Tamiflu, increased his dosage of Neurontin, and scheduled plaintiff for follow-up in three months. (AR 204).

Dr. England wrote three letters regarding plaintiff's condition in May 2012. (AR 200-02). The first letter is dated May 4, 2012, and states only that plaintiff was under Dr. England's medical care and "has difficulty with grasping objects and some restriction in abduction and flexion of the upper extremities secondary to pain." (AR 202). The second letter is dated May 24, 2012, and states, in pertinent part, as follows:

> Mr. Caudill has been diagnosed with fibromyalgia and reactive airway disease. Due to having difficulty with fine motor skills, he is unable to grip items or climb ladders. This could prevent him from performing his required job duties such as, getting readings and hanging, installing and removing blind tags. This could also prevent him from wearing body suits (PPE).
>
> Flare ups of his condition could prevent Mr. Caudill from performing his job duties on a regular basis.

(AR 201).

The third letter is dated May 30, 2012, and states in pertinent part:

> Mr. Caudill has been diagnosed with arthritis, fibromyalgia and reactive airway disease. Due to having difficulty with fine motor skills, he is unable to grip items or

15

climb ladders and stairs.  He is also unable to stand for prolonged periods of time[.]
This could prevent him from performing his required job duties such as, opening and
closing valves, obtaining readings and visually inspecting the area.  This could also
prevent him from wearing body suits (PPE).

Flare ups of his condition could prevent Mr. Caudill from performing his job duties
on a regular basis because he will have good days and bad days.

(AR 200).

Hartford Appeals Specialist Robyn Cote requested independent medical reviews of

plaintiff's claim.  (AR 71).  Hartford thereafter submitted plaintiff's file to a third party service

for a Peer File Review.  (AR 160-182).  As part of the review, three independent medical

examiners reviewed the file and issued decisions in plaintiff's case.  (*Id.*).

a. Dr. Evelyn Balogun, M.D.

Dr. Balogun is a physician who is Board Certified in Occupational and Internal Medicine.

(AR 180).  She reviewed the file and issued a report "from the perspective of occupational

medicine."  (AR 173-180).  She noted that plaintiff had identified anxiety and stress caused by

long work hours as the reason for his work stoppage, and the records suggested he had safety

concerns about the plant's operations and felt overworked.  (AR 173).  Plaintiff had reported that

these issues physically manifested themselves as "fatigue, memory loss, body aches, high blood

pressure, blackouts, and tiredness."  (*Id.*).  Dr. Balogun further noted that plaintiff estimated the

issues leading to his work stoppage began in 2005 and had progressively worsened over time.

(*Id.*).  Dr. Balogun stated that she had reviewed plaintiff's job description and an occupational

analysis prior to issuing her opinion, and these documents identified plaintiff's job as "a medium

physical demand position."  (*Id.*).

Dr. Balogun reviewed treatment notes and reports by PA Atkins, Dr. Darnell, Dr.

Davenport, Dr. England, and Dr. Larsen.  (AR 173-177).  Dr. Balogun noted that Dr. England

evaluated plaintiff on December 15, 2011, at which time she reported 18/18 trigger points, which

16

Dr. England found to be consistent with fibromyalgia. Dr. Balogun noted that Dr. England reported that the range of motion of plaintiff's upper and lower extremities was restricted due to pain, but the degree of restriction was not reported and other test results were reported to have been negative. Dr. Balogun noted that Dr. England diagnosed plaintiff with arthritis and fibromyalgia and prescribed appropriate treatment. (AR 176, citing AR 206). Dr. Balogun also noted that Dr. England completed an APS on January 9, 2012, at which time she reported that plaintiff was being treated for fibromyalgia and arthritis but did not mark any work restrictions. (*Id.*, citing AR 186-187). Dr. Balogun noted Dr. England's evaluation of February 19, 2012, at which time plaintiff reported he was having difficulty grasping objects and was described as having restricted range of motion of the upper and lower extremities, but with no degree of restriction noted. (AR 176). Finally, Dr. Balogun noted that Dr. England authored three letters in May stating that plaintiff remained under her care for fibromyalgia, arthritis, and reactive airway disease; Dr. England had advised that he was restricted from gripping items or climbing stairs because of reported difficulty with fine motor skills; and Dr. England reported that he was unable to stand for long periods of time. (*Id.*). Dr. Balogun also reviewed Dr. Larsen's evaluation results from May 26, 2011, and noted that Dr. Larsen had indicated that plaintiff would not be released to work until cleared by his primary physician. (AR 176-77). Dr. Balogun found, in pertinent part, as follows:

> It is the professional opinion of this reviewer, from the perspective of occupational medicine, that the claimant is capable of working at the medium level without restrictions as of May 08, 2011 to the present.

> This reviewer was able to determine that this man works in a medium physical demand capacity and it is this reviewer's opinion that he would be able to function in a medium physical demand position.

> The records do not substantiate a medical basis for the claimant's work stoppage as of May 08, 2011 until the present.

17

> It was noted that the claimant himself stated that his physical symptoms were
> precipitated by his stress level. Objectively, there are no physical findings which
> would prevent him from working in his own occupation. . . .

(AR 177). Dr. Balogun cited a number of factors in support of her findings, including the

following:

> The lack of any objective evidence documenting the claimant's limitations with
> regards to the nature and/or severity of his arthritic changes, and the lack of any
> objective limitations on the exams completed by Dr. England. The location of his
> arthritic changes is not identified. The claimant had a normal ESR suggesting the
> absence of an inflammatory process. In contrast, he is described as having
> limitations of his upper and lower extremities, but such a presentation would
> reasonably have prompted other work-up and imaging. He had no signs of
> distress on exam and presumably ambulated without assistive devices since there
> is no mention of his needing a cane/crutch/walker. He also required no escalation
> of care such as joint aspiration.

(AR 179-80).

      b.  Dr. Beverly Yamour, M.D.

      Dr. Beverly Yamour, M.D., completed a medical review of the records from the

perspective of a cardiovascular internist. (AR 170-72). She stated that according to the medical

records, plaintiff's blood pressure after May 25, 2011 was controlled, plaintiff had no coronary

artery disease, and his chest pain was non-cardiac. (AR 172). She gave her professional opinion

that plaintiff was not functionally impaired from a cardiovascular standpoint and was capable of

working at the medium level of exertion without restrictions as of May 8, 2011, to the present.

(*Id.*).

      c.  Dr. Julie Hartley, M.D.

      Dr. Julie Hartley, M.D., reviewed the records from a psychiatric perspective. (AR 160-

70). She stated that plaintiff's job entails various inspections for safety purposes, training others,

and following safety guidelines, and the ability to make quick decisions independently, attend to

details, solve problems, reason, and multitask. (AR 168). She determined that based on the

available information, it would be reasonable to allow time off for the evaluation process but

there was not sufficient objective documentation of psychiatric symptoms of such severity that

they would impair plaintiff's ability to work. (*Id*.). Dr. Hartley found no documented objective

abnormalities of significant impairment of self-care, psychomotor activity level, ability to

communicate effectively, affect, attention, concentration, memory, thought content, judgment, or

executive ability. (*Id*.) Dr. Hartley stated: "It was noted that he is angry at the administration at

work, but there is insufficient support that there are symptoms of psychiatric illness that are

impairing his functioning." (*Id*.). She concluded that plaintiff could perform work at the

medium level without restrictions from May 8, 2011 to the present. (*Id*.). She opined:

> [A]lthough there does appear to be support for the presence of psychiatric illness,
> there is insufficient objective support for the presence of symptoms that are
> impairing the claimant's ability to work.

(AR 169).

### G. Hartford decision on appeal

On August 30, 2012, Hartford denied plaintiff's appeal. (AR 61-65). The denial letter to

plaintiff's counsel states, in relevant part:

> [Plaintiff's] psychiatric symptoms that are being followed seem to be his
> subjective report of weakness, tiredness, and low sex drive, as well as his report
> of generally feeling tense. Mental status exams do not document a fatigued or
> tired appearance, his grooming and hygiene are not noted to be inadequate, he has
> no psychomotor retardation, and his affect is noted to be, most often, normal, but
> occasionally congruent with "a little down" mood or constricted. How his
> symptoms impair his functioning is not described. . . . He is not noted to tire
> during sessions, despite notes that he is angry and/or hypertalkative at times.
> Although Dr. Davenport wrote that [plaintiff's] mental status had "deteriorated["]
> in November, it is not clear from her session note what aspects of his mental
> status had a significant decline. He was only noted to be "a little down."
> Although the claimant's attention and concentration were noted to be decreased in
> the psychiatric evaluation of 6/27/11, it is not clear that [sic] the data is that
> supports this. It is also not clear to what degree the decrease is, or whether it is

only during certain parts of the evaluation (such as emotionally difficult parts. . . . Although there does appear to be support for the presence of psychiatric illness, there is insufficient evidence support for the presence of symptoms that are impairing the claimant's ability to work.

In her 8/22/12 report Dr. Beverly Yamour noted the claimant is not functionally impaired from a cardiovascular standpoint of coronary artery disease and is capable of working at the medium level without restrictions as of 5/8/11 to the present. . . .
. . . .

In her 8/22/12 report Dr. Evelyn Balogun notes the claimant is capable of working at the medium level without restrictions as of 5/8/11 to the present. The records do not substantiate a medical basis for the claimant's work stoppage. It was noted that the claimant himself stated that his physical symptoms were precipitated by his stress level. There are no physical findings which would prevent claimant from working in his own occupation. Dr. Davenport's statements indicating [sic] the claimant was . . . back to his baseline. . . . The lack of any evidence documenting the claimant's limitations with regards to the nature and/or severity of his arthritic changes, and the lack of any limitations on the exams completed by Dr. England [sic]. The location of his arthritic changes is not identified. The claimant had a normal ESR suggesting the absence of an inflammatory process. In contrast, claimant is described as having limitations of his upper and lower extremities, but such a presentation would reasonably have prompted other work up and imaging. Claimant had no signs of distress on exam and presumably ambulated without assistive devices since there is no mention of his needing a cane/crutch/walker. He also required no escalation of care such as joint aspiration.

Our file reflects the following facts in part. According to Dr. Davenport [plaintiff] is not capable of performing a full 8 hour work day due to anxiety and depression. . . . Your client's file was independently reviewed by Dr. Julie Hartley who found no support for the presence of symptoms that are impairing [plaintiff's] ability to work. The file was also reviewed by Dr. Yamour who found [plaintiff] is not functionally impaired from a cardiovascular standpoint and is capable of working at the medium level without restrictions. The file was finally reviewed by Dr. Balogun who found the records do not substantiate a medical basis for [plaintiff's] work stoppage; he is capable of working at the medium level without restrictions.
. . . .

An Occupational Analysis has been completed comparing the essential duties, physical demands, environmental conditions and non-exertional requirements of the claimant's Own/Occupation/Employer of Phenol 3 Operator (combination of Chemical Operator and Control Room Operator) at Sunoco, Inc. to the claimant's Own Occupation/National Economy which is a combination of Chemical

Operator III, DOT 559.382-018 and Chief Operator, DOT 558.260-010 as defined
and classified in the [DOT], 1991 edition. . . .
. . . .

In summary, the essential duties are generally equal.  The physical demands are
equal (Medium).  Environmental conditional differ.  The non-exertional
requirements are generally equal.

(AR 62-64).  Hartford concluded that plaintiff was capable of performing medium work and his

occupation was performed within that work level; therefore, he was not disabled.  (AR 64).

## II. The parties' arguments

In support of its decision to deny plaintiff's claim for LTD benefits, Hartford asserts that

the terms of the Plan, the administrative record, and the applicable case law establish that its

decision was reasonable and neither arbitrary nor capricious.  Hartford contends that the records

from plaintiff's treating physicians, psychiatrist, and rheumatologist do not provide objective

evidence of a psychiatric or physical disability.  Hartford argues that it undertook a reasonable

and principled decision-making process.  Hartford contends that the medical reports and opinions

of three independent medical reviewers - psychiatrist Dr. Hartley, occupational medicine

specialist Dr. Balogun, and cardiovascular internist Dr. Yamour, each of whom opined that

plaintiff could perform work at a medium level of exertion - show its decision to deny LTD

benefits is substantially supported and was not arbitrary and capricious.

Plaintiff argues that six factors rendered Hartford's decision to deny his claim for LTD

benefits arbitrary and capricious: (1) Hartford's inherent conflict of interest posed by its dual role

as the entity that both decides and pays claims under the Plan; (2)  Hartford's alleged failure to

consider whether plaintiff could perform the essential duties of his specific occupation; (3)

Hartford's alleged failure to consider the opinion of Sunoco's plant physician, Dr. Paula Larsen,

M.D.; (4) Hartford's alleged failure to conduct a competent review of Dr. England's assessment

that plaintiff was disabled by fibromyalgia; (5) Hartford's reliance on Dr. Balogun's file review

without arranging for an in-person medical examination, despite Dr. Balogun's purported

challenges to plaintiff's credibility; and (6) Hartford's failure to arrange for an in-person

psychiatric evaluation and its decision to instead rely on the opinion of the non-examining

psychiatrist, Dr. Hartley, over the opinion of the treating psychiatrist, Dr. Davenport, despite

what plaintiff purports to be extensive evidence of a mental impairment.

## III. OPINION

### A. Standard of review

The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are to

be resolved using motions for judgment on the administrative record. *Wilkins v. Baptist*

*Healthcare System, Inc.,* 150 F.3d 609, 619 (6th Cir. 1998).  The district court is to conduct its

review "based solely upon the administrative record." *Id. See also Zenadocchio v. BAE Sys.*

*Unfunded Welfare Ben. Plan*, 936 F. Supp.2d 868, 872 (S.D. Ohio 2013).

There is no dispute that Hartford's decision to deny benefits in this case is subject to the

arbitrary and capricious standard of review.  Under the arbitrary and capricious standard of

review, this Court must determine whether Hartford's decision to deny LTD benefits "is the

result of a deliberate, principled reasoning process and . . . is supported by substantial evidence."

*Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of*

*Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).  Substantial evidence means

"much more than a mere scintilla.  It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Holler v. Hartford Life & Acc. Ins. Co.*, 737 F.

Supp.2d 883, 891 (S.D. Ohio 2010) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347

F.3d 161, 171 (6th Cir. 2003)).  When it is possible to offer a "reasoned explanation" for the

decision to deny benefits based on the evidence, the outcome is not arbitrary or capricious. *Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 604 (6th Cir. 2012) (citing *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1996)).

The arbitrary and capricious standard of review is not a mere rubber stamp of the plan administrator's decision. *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 508 (6th Cir. 2009) (citing *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005)); *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald*, 347 F.3d at 172). As the Sixth Circuit in *McDonald* stated:

> [T]he district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence--no matter how obscure or untrustworthy--to support a denial of a claim for ERISA benefits.

347 F.3d at 172. "Deferential review is not no review, and deference need not be abject." *Id.* (internal quotation and citation omitted).

**B. This matter should be remanded for further administrative proceedings.**

The question to be determined is whether Hartford's decision "is the result of a deliberate, principled reasoning process" and whether it is "supported by substantial evidence"; if so, the decision will be upheld. *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 449 (6th Cir. 2008) (citing *Elliott v. Metro. Life. Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006) (quoting *Glenn,* 461 F.3d 660, 666 (6th Cir. 2006)). The Court finds based on a careful review of the record and for the reasons explained below that Hartford's decision was not the result of a "deliberate, principled reasoning process" but was based on an incomplete and insufficient

record and review process.  Hartford's decision to deny LTD benefits therefore should be reversed and this matter should be remanded for further administrative proceedings.

### 1. Conflict of interest

Plaintiff contends that Hartford, as the administrator vested with discretion to determine eligibility for benefits and the payer of those benefits under its Plan, has a conflict of interest which is a factor to be considered in determining whether Hartford abused its discretion in denying benefits.  Plaintiff contends that Hartford's failure to arrange for an in-person independent medical examination in his case suggests that its decision-making was clouded by its conflict of interest.

In applying the arbitrary and capricious standard, a court must consider and evaluate potential conflicts of interest that may affect the plan administrator's decision.  *See Glenn,* 461 F.3d at 666.  An apparent conflict of interest exists where, as here, the plan administrator both reviews and pays claims.  *See id.*  The conflict of interest occurs because the company that both funds and administers the plan incurs a direct expense as a result of the allowance of a claim, and it benefits directly from the denial or discontinuation of a claim that it would otherwise be obligated to pay.  *See Killian v. Healthsource Provident Administrators*, 152 F.3d 514, 521 (6th Cir. 1998).  A conflict of interest does not change the standard of review, but it is simply one consideration a court weighs in applying the arbitrary and capricious standard.  *Vochaska v. Metro. Life Ins. Co.*, No. 1:12-cv-1070, 2014 WL 222116, at *6 (W.D. Mich. Jan. 21, 2014) (citing *Smith v. Continental Cas. Co.,* 450 F.3d 253, 260 (6th Cir. 2006)).  A conflict of interest "is a red flag that may trigger a somewhat more searching review of a plan administrator's decision," although the arbitrary and capricious standard remains in place.  *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311-12 (6th Cir. 2010) (citing *Metro. Life Ins. Co. v. Glenn,*

554 U.S. 105, 114-16 (2008)). When there is "significant evidence in the record that the insurer was motivated by self-interest," a conflict of interest carries "more than only some weight." *Vochaska*, No. 1:12-cv-1070, 2014 WL 222116, at *6 (citing *Contintental Cas. Co.,* 450 F.3d at 260). Plaintiff has the burden to show that "'a significant conflict' was present." *Id.* (citing *Continental Cas. Co.*, 450 F.3d at 260).

In the instant case, Hartford, as both the decision maker and the payer of claims, faces a potential conflict of interest when determining whether to grant or deny a disability claim. However, plaintiff has not come forward with any specific evidence to show that the conflict of interest should be given "more than only some weight" in this case. *See id.* Plaintiff has not pointed to any evidence in the record which suggests that Hartford was motivated by self-interest to rely on only a file review and to deny plaintiff's claim for LTD benefits based on that review. Accordingly, plaintiff has not carried his burden to show that "a significant conflict" was present under the specific circumstances of this case. *Id.* (citing *Continental Cas. Co.*, 450 F.3d at 260). While the conflict of interest is a factor to be considered here, it does not significantly alter the Court's level of review under the arbitrary and capricious standard.

### 2. Hartford's alleged failure to consider plaintiff's own occupation

Plaintiff argues that Hartford's decision was not the product of reasoned decision-making because when determining whether he was "disabled" under the terms of the Plan, Hartford failed to consider the extent to which plaintiff's limitations affected his ability to perform the essential duties of his specific occupation. Plaintiff alleges that instead, Hartford determined only whether he could work in *any* medium strength job. Plaintiff contends this was error because the medical evidence establishes that he cannot perform many of the essential functions of his particular job. Specifically, plaintiff contends that the medical evidence establishes he

cannot climb (AR 200), but his job at Sunoco requires "frequent" climbing (AR 127); he lacks

the ability to perform fine hand manipulation (AR 200), but his job requires a good deal of hand

manipulation, including the opening and closing of valves that regulate the flow of toxic

chemicals, at times on an emergency basis (AR 126, 128, 129); he has experienced memory

lapses and suffers from fatigue, (AR 137-38, 217, 231), which would affect how he manages task

such as "monitoring hundreds of loops," "mak[ing] quick precise adjustments and decisions,"

and responding to "abnormal situations, alarms and emergencies" (AR 193); and he is unable to

think clearly and react quickly for the safety of others (AR 193), but his job entrusts the

employee with "[g]reat responsibility for the safety and health of others" and the job description

notes that errors in completing details accurately "could cause serious safety problems in the

plant or for other workers[.]" (AR 193). (Doc. 16 at 11-12). Plaintiff further contends that

Hartford did not address the "critical thinking" and "high stress" aspects of his job, which are

implicated in simultaneously operating a number of chemical processes. (*Id*. at 11).

The evidence does not bear out plaintiff's contention that Hartford failed to consider

whether he could perform the particular functions of his job position and instead improperly

analyzed whether he could perform *any* medium strength job. Rather, the record shows that in

rendering its decision, Hartford took into account both the exertional and nonexertional duties of

plaintiff's specific job. Rehabilitation Case Manager Wayne Blake performed an Occupational

Analysis Report for Hartford in November 2011, which took into account the physical demands,

environmental conditions, and non-exertional requirements of plaintiff's specific job and

concluded that plaintiff's job was performed at the medium level of exertion. (AR 81).

Hartford's reviewing psychiatrist, Dr. Hartley, noted the nonexertional requirements of

plaintiff's specific job in her report (AR 160), and Dr. Balogun stated that prior to providing her

opinion, she reviewed plaintiff's job description and an occupational analysis report, both of

which identified plaintiff's job as a medium strength position. (AR 173). There is no indication

either physician failed to take plaintiff's particular job duties into account when rendering their

opinions. Moreover, Hartford referred plaintiff's claim file for an updated Occupational

Analysis on appeal, which took into account new information provided by plaintiff's supervisor,

Paul Brian Lodwick, regarding the essential duties of Control Room Operator and Chemical

Operator, as well as the previously submitted job description and Physical Demands Analysis

form for Phenol 3 Operator. (AR 63). The denial letter set forth the essential duties, physical

demands, environmental conditions, and non-exertional requirements of plaintiff's job. Hartford

concluded from its review that plaintiff was "medically capable of performing medium work and

his occupation is performed within that work level." (AR 64). Hartford performed the following

comparison between plaintiff's job and the job of Chemical Operator III in the D.O.T. and found

both were performed at the medium level of exertion and had comparable non-exertional

requriements:

> 1. ESSENTIAL DUTIES: The essential duties of controlling equipment units or
> system that processes chemical substances into specified industrial or consumer
> products, according to knowledge of operating procedures, chemical reactions,
> laboratory test results, and correlation of process instrumentation in combination
> with controlling chemical process equipment from instrumented control board or
> other control station are generally equal.
> 2. PHYSICAL DEMANDS: Equal. Chief Operator, DOT 558.260-010 is Light
> and Chemical Operator III is Medium. In combination, Own Occ/NE is Medium
> with frequent climbing, reaching, handling, fingering, talking, hearing, near
> acuity, far acuity, color vision, accommodation, and depth perception. Own
> Occ/ER (considering both the PDA and the document from Paul Brian Lodwick)
> is also Medium requiring lifting, carrying, pushing, and/or pulling of forces
> ranging from 5 lbs to 50 lbs with standing 4 hours/day, sitting 5 hours/day,
> walking 3 hours/day and frequent balancing, stooping, kneeling, crouching,
> climbing, reaching in all planes, handling, fingering, and feeling and occasional
> airplane travel.
> 3. ENVIRONMENTAL CONDITIONS: In combination, Own Occ/NE involves
> exposure to [l]oud noise and frequent exposure to atmospheric conditions and

other environmental conditions. Own Occ/ER, per the PDA, involves exposure to extreme cold, wet/humid conditions, fumes/[dust]/dirt/smoke, confined areas, high places, equipment in motion, noise, and mechanical/electrical/chemical hazards.
4. NON-EXERTIONAL REQUIREMENTS: Equal in terms of making judgments and decisions, attaining precise set limits, tolerances, and standards; analyzing; compiling; taking instructions; speaking-signaling; setting up; and operating-controlling.

In summary, the essential duties are generally equal. The physical demands are equal (Medium). Environmental conditions differ. The non-exertional requirements are generally equal.

(AR 64).

This in-depth analysis of plaintiff's job duties shows that Hartford did not limit its consideration to whether plaintiff could perform *any* job at the medium exertion level but instead considered the essential duties of his specific job. Plaintiff has not shown any error in this regard.[7]

### 3. Rejection of Dr. Larsen's opinion

Plaintiff alleges that Hartford's decision was arbitrary and capricious because defendant ignored the opinion of Dr. Paula Larsen, M.D., whom plaintiff describes as Sunoco's "plant physician." (Doc. 16 at 13). Plaintiff asserts that Dr. Larsen decided, "without qualification," that he "was disabled from working at his own occupation." (*Id.*, citing AR 217, 219). Plaintiff alleges that Dr. Larsen was uniquely qualified to determine whether he was disabled from working at his own occupation and that Hartford rejected her opinion without justification or analysis. (Doc. 16 at 13).

Plaintiff has not shown that Hartford acted unreasonably by failing to find he was disabled based on Dr. Larsen's opinion. Contrary to plaintiff's interpretation of the medical records, Dr. Larsen never offered an opinion "without qualification" that plaintiff was "disabled

---

[7] To the extent plaintiff alleges the medical evidence shows he is unable to perform certain essential functions of his position, those arguments are addressed elsewhere in the Report and Recommendation.

from working at his own occupation." (Doc. 16 at 13). Rather, Dr. Larsen opined in a Return to

Work Evaluation completed on May 26, 2011, only that plaintiff was "not cleared to return to

work until further evaluation by a specialist M.D. [a psychiatrist] and then [follow-up] in

occupational medicine." (AR 217, 219). Her recommendation is not tantamount to a

determination that plaintiff was unable to perform the essential functions of his position so as to

meet the definition of "disabled" under the Plan's terms. Dr. Larsen's conclusions were tentative

in nature, she did not offer a prognosis, and she did not provide an opinion as to the expected

duration of any physical or mental impairment. (AR 217, 219). Further, Dr. Larsen declined to

provide medical records and to complete an APS in October 2011 at Hartford's request,

deferring instead to plaintiff's treating physician. (AR 99). For these reasons, Hartford did not

act unreasonably by failing to find plaintiff disabled based on Dr. Larsen's May 26, 2011 Return

to Work Evaluation.

### 4. Dr. Balogun's qualifications to conduct a file review in this matter

Plaintiff argues that Hartford's decision to rely on the opinion of Dr. Balogun, a specialist

in occupational and internal medicine, was arbitrary and capricious because Dr. Balogun lacks

expertise in the area of fibromyalgia and therefore was not qualified to conduct a file review in

this case. Hartford counters that the case law supports the proposition that a physician who

specializes in internal or occupational medicine is qualified to render an opinion on fibromyalgia.

ERISA requires that any participant whose claim has been denied must be afforded a

"reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the

decision denying the claim." 29 U.S.C. § 1133(2). In order to provide a claimant with a

reasonable opportunity for a "full and fair" review of a claim determination, the claims

procedures must provide that "(iii) . . . in deciding an appeal of any adverse benefit

determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment[.]" 29 C.F.R. § 2560.503-1(h)(3)(iii). Other courts have recognized that a physician who specializes in internal or occupational medicine is qualified to offer an opinion on fibromyalgia. *See Fitzpatrick v. Bayer Corp.*, 04 CIV.5134 (RJS), 2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008) (finding no requirement that physicians specially trained in the diagnosis of CFS or fibromyalgia be retained to examine the plaintiff or her records in a recovery of benefits case); *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 582 (8th Cir. 2008) (the plaintiff pointed to no evidence calling into question the expertise of a doctor who specialized in occupational medicine to offer an opinion on the condition of fibromyalgia).

As evidence that Dr. Balogun was not qualified to render an opinion in this case, plaintiff points only to Dr. Balogun's statement that there were no "objective" physical findings to support plaintiff's claim. (Doc. 16 at 17). Plaintiff argues this statement underscores Dr. Balogun's lack of understanding of fibromyalgia because Dr. England's trigger point assessment constitutes objective evidence of fibromyalgia. However, this argument goes to the merits of Dr. Balogun's assessment and has no bearing on whether she was qualified to render an opinion in plaintiff's case. Plaintiff has not shown that Dr. Balogun, a specialist in internal and occupational medicine, lacked the appropriate training and experience to render an opinion on the subject of fibromyalgia. Nor does the case law support plaintiff's position that a doctor in Dr. Balogun's fields of specialty lacks the qualifications to offer an opinion in this area. The Court therefore finds no violation of 29 C.F.R. § 2560.503-1(h)(3)(iii) in connection with the selection of Dr. Balogun to conduct the file review.

**5. Hartford's failure to perform an in-person independent medical examination**

Plaintiff contends that Hartford's decision to reject the opinions of his treating

psychiatrist, Dr. Davenport, and treating rheumatologist, Dr. England, based only on a file

review was arbitrary and capricious.  Plaintiff contends that Dr. Balogun repeatedly challenged

his credibility, which triggered Hartford's obligation to arrange for a personal medical

examination.  Plaintiff also argues that Hartford was obligated to arrange for a personal

psychiatric evaluation in light of the extensive evidence of a mental impairment.  Plaintiff

contends that Hartford's failure to arrange for personal psychiatric and physical examinations is

persuasive evidence that its decision was arbitrary and capricious.  Hartford argues that it was

not bound to arrange for in-person medical examinations of plaintiff and that it reasonably relied

on the reports of three independent medical examiners.

A Plan administrator is not obligated to give deference to a claimant's treating

physicians' opinions over the opinions of its own consulting physicians.  *Black & Decker*

*Disability Plan v. Nord,* 538 U.S. 822 (2003).  The opinions of a treating physician are not

entitled to a presumption of deference when evaluating a denial of benefits under an ERISA plan.

*Id*.  *See also McDonald,* 347 F.3d at 169 (stating that when a plan administrator chooses to rely

on the medical opinion of one doctor over another, that decision is rarely arbitrary and capricious

because it would be possible to offer a reasoned explanation, based upon the evidence, for the

plan administrator's decision); *Vochaska*, No. 1:12-cv-1070, 2014 WL 222116, at *6 (finding

district court was bound by Supreme Court decision in *Nord* rejecting treating physician rule in

ERISA cases).  However, a plan may not arbitrarily disregard such opinions in making a benefits

determination.  *Vochaska,* No. 1:12-CV-1070, 2014 WL 222116, at *6.  "Generally speaking, a

plan may not reject summarily the opinions of a treating physician, but must instead give reasons

for adopting an alternative opinion." *Id*. (citing *Elliott,* 473 F.3d at 620). Thus, a plan

administrator is not bound to accept a treating physician's opinion, but the administrator may not

reject a treating physician's opinion without reason. *Id*.

There is "nothing inherently objectionable" about a Plan administrator relying on a file

review by a qualified physician when making a benefits determination. *Zenadocchio*, 936 F.

Supp.2d at 889 (citing *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 296 (6th Cir. 2005)). The

Sixth Circuit has declined to adopt a blanket rule that the failure to perform an independent

medical examination renders a decision to deny benefits arbitrary and capricious. *Calvert,* 409

F.3d at 295. This is true even when a psychiatric impairment is at issue. *Smith v. Bayer Corp.*

*Long Term Disability Plan,* 275 F. App'x 495, 508 (6th Cir. 2008) (plan administrator's reliance

on file review does not, standing alone, require conclusion that plan administrator acted

improperly). However, the Sixth Circuit has acknowledged that the failure to conduct such an

examination may be a factor to be taken into consideration. *Calvert,* 409 F.3d at 295 ("while . . .

[the plan administrator's] reliance on a file review does not, standing alone, require the

conclusion that [the plan administrator] acted improperly, we find that the failure to conduct a

physical examination - especially where the right to do so is specifically reserved in the plan -

may, in some cases, raise questions about the thoroughness and accuracy of the benefits

determination). *See also Zenadocchio*, 936 F. Supp.2d at 889 ("the decision to conduct file

reviews, rather than a physical examination, is a factor properly considered in determining

whether Hartford's decision was arbitrary and capricious") (citing *Rose,* 268 F. App'x at 450;

*Hunter v. Life Ins. Co. of N. Am.,* 437 F. App'x 372, 378 (6th Cir. 2011) ("The failure to perform

a physical examination is 'one factor that we may consider in determining whether a plan

administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its

consulting physician.'") (citations omitted)).

The Sixth Circuit "has frowned on file-only reviews where the reviewer makes a

credibility determination. . . ." *Vochaska*, No. 1:12-cv-1070, 2014 WL 222116, at *8 (citing

*Judge v. Metro. Life. Ins. Co*, 710 F.3d 651, 663 (6th Cir. 2013)). Thus, the Court in *Vochaska*

found the file-only review to be inadequate where, among other factors, the administrator

"implicitly discredited [the plaintiff's] self-reported symptoms" as described by the treating

doctor. *Id*. *See also Caesar v. Hartford Life & Acc. Ins. Co.*, 464 F. App'x 431, 435-36 (6th Cir.

2012) (decision to deny benefits was arbitrary and capricious where an independent review

physician did not speak with any of the claimant's treating physicians and he appeared not to

have thoroughly reviewed the record; both of the independent review physicians at least

implicitly discredited plaintiff's subjective complaints of pain; the independent review

physicians failed to adequately explain why they rejected the opinions of the claimant's treating

physicians; and Hartford relied on a file review rather than a physical examination)). As found

by the court in *Zenadocchio*, 936 F. Supp.2d at 890:

> Especially when an issue exists as to the credibility of a claimant's subjectively-
> reported symptoms, the plan must follow reasonable procedures in deciding that
> issue. So, for example, "credibility determinations made without the benefit of a
> physical examination support a conclusion that the decision was arbitrary."
> *Helfman v. GE Group Life Assur. Co.,* 573 F.3d 383, 395-96 (6th Cir. 2009); *see
> also Calvert v. Firstar Fin., Inc.,* 409 F.3d at 296-97 (conclusion that a claimant
> had subjectively exaggerated her symptoms was "incredible on [its] face" when
> physician reaching that conclusion never examined the claimant). This is
> particularly true when there is, in fact, objective medical evidence of the
> underlying condition which forms part of the basis of an opinion that a claimant is
> disabled due to pain, and the plan administrator performs a selective, rather than
> comprehensive, review of the records in reaching the opposite conclusion. *See,
> e.g., Ebert v. Reliance Standard Life Ins. Co.,* 171 F. Supp.2d 726, 739-40 (S.D.
> Ohio 2001) (where the record contained evidence of physical conditions which
> could reasonably cause pain, it was a "complete misreading of the medical

records . . . to say that Plaintiff's complaints of pain or weakness . . . are subjective and unverifiable").

*Id.*

Conversely, the Sixth Circuit has found that where the reviewing physician's conclusions are amply supported by the record and there is considerable objective evidence of the plaintiff's ability to work, reliance on a file review that includes a subjective credibility determination is not arbitrary and capricious. *See Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 606 (6th Cir. 2012) (reviewing doctor's conclusion that the plaintiff's subjective claims of chronic pain were "not supported" was "in effect, a subjective credibility determination best made with the assistance of an actual medical examination"; however, the doctor's remaining conclusions were amply supported by the record and the "existence of considerable objective evidence in support of [the plaintiff's] ability to perform sedentary work distinguish[ed] his case from others in which the absence of a medical exam carried additional weight[.]"); *Curry v. Eaton Corp.*, 400 F. App'x 51, 67 (6th Cir. 2010) (credibility was not material to disability determination where the plan asked only whether "sufficient objective evidence exists to support a finding of 'disabled'," and there was no indication in the record that defendants or any of the reviewing physicians relied upon a credibility determination to any extent in coming to that conclusion).

### i. Dr. Balogun made subjective credibility determinations.

As a threshold matter, there is an issue as to whether Dr. Balogun made subjective credibility determinations in her report. Plaintiff contends that the following portions of Dr. Balogun's reports contain credibility findings which were improperly made on a file review without an examination of plaintiff by Dr. Balogun:

> The records substantiate that the claimant was removed from work because of his report of chest pain and that he was referred for further work-up to address an underlying cardiac condition. Numerous other statements suggest that he was not satisfied with his employment position and was looking for alternate work. These records would suggest that this is a job fit issue, and use of functional impairment and

work stoppage should not be used as a means for addressing the claimant's satisfaction with his work. . . . There would have been other formats for him to address his concerns about a work place safety matter in lieu of seeking functional impairment. One should reasonably expect that he has appropriate appreciation of the systems in place to address his safety concerns in light of his position as a chief board operator.

. . . .

Guidelines on management of chronic pain highlight that some individuals may self-limit their occupational activities. This self-perception of incapacity is further amplified by prescribed poorly applied work restrictions, as exists here.

(AR 179).

Hartford disagrees with plaintiff's position that Dr. Balogun questioned plaintiff's credibility through these statements. Hartford insists that statements in the first two paragraphs quoted above "reflect nothing more than [Dr. Balogun's] personal opinion that if [plaintiff's] job was making him sick, then he should consider looking for another job." (Doc. 19 at 10). Hartford further argues that the last quoted paragraph "describes and applies guidelines on management of chronic pain" and "implicitly *accepts*" plaintiff's complaints of chronic pain. (*Id.*) (emphasis in original). Hartford seeks to distinguish cases where the reviewing physician impermissibly concluded that the claimant's complaints were not credible on the ground that the challenged statements in such cases "conveyed a belief that the claimant was exaggerating or embellishing his or her claims of pain, stress or other physical condition." (Doc. 19 at 11). Hartford contends that Dr. Balogun made no such statement in this case and actually accepted plaintiff's diagnoses and the veracity of his complaints as demonstrated by the following statements in her report:

- "claimant . . . has been noted to have a history of hypertension, arthritis, fatigue, fibromyalgia" (AR 173)

- PA Atkins "documented [plaintiff's] report of increased stress at work" (AR 173)

- PA Atkins was "noted to have characterized his generalized body aches as a chronic issue which had been ongoing for four to five years and [were] aggravated by work or stress at work." (AR 173)

- "It was noted that the claimant himself stated that his physical symptoms were precipitated by his stress level. Objectively, there are no physical findings which would prevent him from working in his own occupation." (AR 177).

Initially, the Court finds these statements of Dr. Balogun cited by Hartford were part of her overview of the findings of plaintiff's treating providers and their reports of his subjective complaints. By including these statements in her report, Dr. Balogun was not endorsing either the diagnoses made by plaintiff's treating providers or plaintiff's complaints. Thus, these statements do not, as Hartford argues, demonstrate that Dr. Balogun accepted plaintiff's diagnoses as accurate and his complaints as truthful.

Moreover, the Court finds that although the meaning of Dr. Balogun's statements quoted by plaintiff is not entirely clear, it appears Dr. Balogun implicitly discounted the credibility of plaintiff's complaints by questioning whether there was a mental or physical cause for plaintiff's self-reported symptoms, as well as whether plaintiff's motivations for seeking LTD disability were proper. Dr. Balogun appears to have reduced the source of plaintiff's complaints to job stress. However, it is not clear whether she believed plaintiff actually experienced any stress-related symptoms. Rather, Dr. Balogun appears to have discounted plaintiff's subjective reports of job-induced stress and resultant symptoms by referring to "*perceived* stress at work" and pondering why plaintiff did not seek alternate employment "*if* his dissatisfaction with his job was causing stress and associated body aches." (AR 180) (emphasis added). By her remarks, Dr. Balogun displayed skepticism as to whether plaintiff suffered from a physical or mental impairment resulting in any of the symptoms he alleged. Dr. Balogun also apparently was of the opinion that plaintiff had stopped working and had applied for LTD benefits because he had workplace safety concerns and was dissatisfied with his particular job, not because of limitations imposed by any actual physical or mental impairments. Dr. Balogun deduced from statements in

36

the record suggesting plaintiff was dissatisfied with his job and was looking for alternate work that plaintiff's problems may have stemmed from "a job fit issue" and that he was improperly addressing this job satisfaction issue by "use of functional impairment and work stoppage." (AR 179). Dr. Balogun stated plaintiff could address work place safety concerns through other avenues "in lieu of seeking functional impairment" and that he should know "of the systems in place to address his safety concerns" because of his job position. (*Id*.). In addition, it is not entirely clear what Dr. Balogun meant when she stated that "some individuals may self-limit their occupational activities," particularly in a case such as this involving "prescribed poorly applied work restrictions." (*Id*.). Nevertheless, her comments strongly suggest she did not believe plaintiff was limited to the extent he claimed.

Accordingly, the Court finds that by questioning whether there was a mental or physical basis for plaintiff's self-reported symptoms, whether plaintiff was impaired to the extent he claimed, and whether plaintiff's motivations for seeking LTD benefits were proper, Dr. Balogun implicitly discounted the credibility of plaintiff's complaints. Dr. Balogun's subjective credibility determinations, when considered with the remaining evidence of record, factor into a determination that Hartford's decision to deny plaintiff's claim was arbitrary and capricious for the reasons explained below.

**ii. Hartford's decision to deny LTD benefits without an in-person medical examination was arbitrary and capricious.**

**a. Plaintiff's mental condition**

Hartford's August 30, 2012 denial letter "should be the principal point of reference" in the Court's review of the challenged denial of benefits. *University Hosps. of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 848 n. 7 (6th Cir. 2000). In the denial letter, Hartford relied on the report of Dr. Hartley, the file review psychiatrist, who concluded there was insufficient

37

objective evidence to support the presence of psychiatric symptoms that impaired plaintiff's

ability to work.  (AR 62).  Hartford denied plaintiff's claim for LTD benefits insofar as it was

premised on the medical evidence from treating psychiatrist Dr. Davenport based on the lack of

support for the presence of disabling symptoms.  (AR 63).

     Hartford contends that its reliance on Dr. Hartley's file review report was reasonable, and

plaintiff has not shown that any portion of her report was inaccurate or incorrect.  Hartford

alleges that it was under no obligation to conduct in-person medical examinations under the

circumstances presented by this case.

     Plaintiff contends that Hartford's rejection of Dr. Davenport's treating psychiatric

opinion in favor of the opinion of the file review psychiatrist, Dr. Hartley, was unreasonable.

Plaintiff argues that the evidence of his mental impairment was extensive and the Sixth Circuit

has held that a file review is an inadequate basis upon which to deny a claim when mental illness

is the disability in question; instead, the administrator is obligated to arrange for an in-person

psychiatric evaluation.  (Doc. 16 at 14-15, citing *Bayer Corp. Long Term Disability Plan*, 275 F.

App'x at 495; *Continental Cas. Co.*, 450 F.3d at 263; *Calvert*, 409 F.3d at 295).  Plaintiff asserts

that insofar as Hartford doubted Dr. Davenport's conclusions and questioned the legitimacy of

plaintiff's subjective complaints, Hartford was bound to arrange for an in-person psychiatric

evaluation of plaintiff.

     After careful review of the record, the Court agrees with plaintiff and finds that under the

circumstances presented by this case, Hartford's failure to conduct an in-person medical examination

to ascertain the nature and extent of plaintiff's psychiatric illness is persuasive evidence that its

decision to deny LTD benefits was arbitrary and capricious.

Dr. Hartley's file review report reflects considerable uncertainty about the source of plaintiff's self-reported symptoms and the extent of his mental impairment.  Dr. Hartley wrote in her report as follows:

> The claimant's psychiatric symptoms that are being followed *seem to be* his subjective report of weakness, tiredness, and low sex drive, as well as his report of generally feeling tense.  *Mental status exams do not objectively document* a fatigued or tired appearance, his grooming and hygiene are not noted to be inadequate, he has no psychomotor retardation, and his affect is noted to be, most often, normal, but occasionally congruent with "a little down" mood or constricted.  *How his symptoms impair his functioning is not described.*  He is noted to have gone fishing three times during the summer.  During the summer, his ability to tolerate the administration at work is noted to be improved.  He is not noted to tire during sessions, despite notes that he is angry and/or hypertalkative at times.
>
> *Although Dr. Davenport wrote that the claimant's mental status had "deteriorated" in November, it is not clear from her session note what aspects of his mental status had a significant decline.*  He was only noted to be "a little down."  *Although the claimant's attention and concentration were noted to be "decreased" in the psychiatric evaluation of June 27, 2011, it is not clear what the data is that supports this* (i.e. whether it is the claimant's report, or whether serial 7's, or another objective measure were done in the office).  *It is also not clear to what degree the decrease is*, or whether it was only during certain parts of the evaluation (such as emotionally difficult parts).  *Cognitive deficits are not further tracked* or noted by psychiatry or noted to be present in other evaluations.

(AR 166-67) (emphasis added).  Dr. Hartley concluded that although "*there does appear to be support for the presence of psychiatric illness, there is insufficient objective support of the presence of symptoms that are impairing the claimant's ability to work.*"  (AR 169) (emphasis added).

A number of Dr. Hartley's findings are tentatively phrased, and they show there are gaps in the record concerning how Dr. Davenport reached her conclusions; whether those conclusions were based on plaintiff's subjective reports or objective tests and findings; how plaintiff's mental functioning had deteriorated and the extent of the decrease in his functioning; and whether there is data to verify the severity of plaintiff's psychiatric illness.  Yet, despite the ambiguities in Dr. Hartley's findings and the gaps in the record, Hartford did not arrange for an in-person

psychiatric evaluation in an effort to obtain clarification of the issues raised in Dr. Hartley's

report and to determine whether there was an objective basis for the psychiatric symptoms

reported by plaintiff. Hartford's decision to deny plaintiff LTD benefits in the face of a medical

record that its own file review psychiatrist indicated was far from clear in many respects,

notwithstanding the apparent presence of psychiatric illness, weighs in favor of a finding that

Hartford's decision was arbitrary and capricious.

### b. Plaintiff's physical condition

Hartford relied on Dr. Balogun's file review to discount Dr. England's treating physician

report and to determine there was no physical disability by finding as follows:

> In her 8/22/12 report Dr. Evelyn Balogun notes the claimant is capable of working
> at the medium level without restrictions as of 5/8/11 to the present. The records
> do not substantiate a medical basis for the claimant's work stoppage. It was noted
> that the claimant himself stated that his physical symptoms were precipitated by
> his stress level. There are no physical findings which would prevent claimant
> from working in his own occupation.

(AR 63).

Hartford argues that it was reasonable for Hartford's Appeal Specialist Robyn Cote to

rely upon Dr. Balogun's conclusion that the records do not substantiate a medical basis for

functional impairment from fibromyalgia or arthritis or for plaintiff's work stoppage, even if Dr.

Balogun's report could be construed as making credibility determinations. (Doc. 15 at 18, citing

AR 173-80; Doc. 19 at 11-12, citing *Cook*, 494 F. App'x at 606; *Curry*, 400 F. App'x at 67).

Hartford asserts that Dr. Balogun reviewed the records and spoke with PA Atkins, and Dr.

Balogun noted the lack of evidence documenting the nature, location, and/or severity of

plaintiff's arthritic changes; the lack of evidence documenting his limitations; the normal ESR

suggesting the absence of an inflammatory process; the absence of a work-up or imaging

regarding the pain in his upper and lower extremities; the absence of signs of distress or the use

of assistive devices; and the fact that he did not need escalated care such as joint aspiration.

(Doc. 15 at 18).  Hartford acknowledges that Dr. England found 18/18 tender fibromyalgia

points and restricted range of motion of the upper and lower extremities due to pain on

December 15, 2011 (*Id*. at 22, citing AR 205-06); however, Hartford notes that Dr. England did

not indicate that plaintiff was unable to work, and she did not list any restrictions or limitations

in the APS she completed in January 2012.  (AR 186-87).  Hartford also states that a note from

Dr. England's February 9, 2012 office visit indicated that plaintiff's pain had improved (AR 203-

04), and Dr. Balogun "reasonably concluded that there were no objective physical findings that

[plaintiff] could not work in his own occupation."  (Doc. 19 at 11, citing AR 173-80).  Hartford

alleges there were "no objective findings of functional limitations."  (Doc. 19 at 6).

    In response, plaintiff alleges that contrary to Hartford's contention, Dr. England did

indicate he had work restrictions.  (Doc. 20 at 3).  Specifically, Dr. England opined in her May

30, 2012 letter that due to difficulty with fine motor skills, plaintiff is unable to grip items or

climb ladders, and he is also unable to stand for prolonged periods of time.  (*Id*., citing AR 200).

Dr. England indicated that these restrictions "could prevent him from performing his required job

duties such as, opening and closing valves, obtaining readings and visually inspecting the area

[and] wearing body suits (PPE)."  (*Id*.).  Plaintiff alleges that Dr. England's finding of 18/18

positive trigger points is objective evidence of fibromyalgia which supports the functional

limitations she imposed.  Plaintiff contends that Dr. Balogun ignored this objective evidence

when rendering her assessment of the record.

    This Court has recognized that "[a] fibromyalgia diagnosis can be vexing because it

cannot be confirmed by medical or laboratory testing and commonly turns on subjective reports

of pain." *Holler*, 737 F. Supp.2d at 891 (citing *Green v. Prudential Ins. Co.,* 383 F. Supp.2d

980, 996 (M.D. Tenn. 2005)).  As the Sixth Circuit has acknowledged:

> In stark contrast to the unremitting pain of which fibrositis[8] patients complain,
> physical examinations will usually yield normal results-a full range of motion, no
> joint swelling, as well as normal muscle strength and neurological reactions.
> There are no objective tests which can conclusively confirm the disease. . . .
> Unlike most diseases that can be confirmed or diagnosed by objective medical
> tests, fibrositis can only be diagnosed by elimination of other medical conditions
> which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness,
> and fatigue.

*Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815, 817-819 (6th Cir. 1988).  Instead, the

standard for diagnosing fibromyalgia involves testing a series of focal points for tenderness and

ruling out other possible conditions through objective medical and clinical trials.  *Germany-*

*Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) (citing *Rogers v.*

*Commissioner of Social Sec.,* 486 F.3d 234, 244 (6th Cir. 2007)).  Other courts have recognized

that "the claimant's subjective, uncorroborated complaints of pain constitute the only evidence of

[fibromyalgia's] severity [and] the medical inquiry is therefore intertwined with questions of the

claimant's credibility. . . ."  *Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x

696, 705 (10th Cir. 2007) (citing *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370

F.3d 869, 878 (9th Cir. 2004), *overruled on other grounds by, Abatie v. Alta Health & Life Ins.*

*Co.*, 458 F.3d 955 (9th Cir. 2006) (en banc)).

    Despite Dr. England's diagnosis of fibromyalgia and the subjective nature of the disease,

Dr. Balogun discounted plaintiff's allegations of muscle pain and weakness, and she failed to

take into account restrictions noted by Dr. England in her May 2012 letters, based on the lack of

any objective limitations on examination by Dr. England.  (AR 177-78).  Dr. Balogun did so

without addressing the validity of Dr. England's fibromyalgia diagnosis based on a tender points

---

[8] "Fibrositis" is another term for fibromyalgia.  *See* http://www.thefreedictionary.com/fibromyalgia.

analysis and the restrictions she found. While Hartford was not bound to accept plaintiff's subjective complaints based on Dr. England's diagnosis and assessment (*see Meraou*, 221 F. App'x at 704-06), neither was it reasonable for Hartford to disregard plaintiff's subjective complaints without conducting an in-person medical examination given Dr. Balogun's findings indicating that credibility was a key factor in the disability determination. Dr. Balogun's implicit discounting of plaintiff's credibility, coupled with Dr. England's fibromyalgia diagnosis and related findings, renders Hartford's reliance solely on a file review to discount plaintiff's subjective complaints and Dr. England's findings inadequate. *See Continental Cas. Co.*, 450 F.3d at 263 (decision to not perform in-person medical examination to evaluate the plaintiff's pain supported a finding the claim determination was arbitrary and capricious where the administrator reserved the right to obtain an independent medical examination, and the reviewing doctor made credibility determinations regarding the plaintiff's subjective complaints). The Court concludes that under these circumstances, Hartford's decision to deny plaintiff's claim for benefits without conducting an in-person physical examination weighs in favor of a finding that Hartford's decision was arbitrary and capricious.

## IV. CONCLUSION

The Court finds upon consideration of the relevant factors and the particular facts of this case that Hartford did not engage in a reasonable, principled process when deciding the extent to which plaintiff's mental illness and fibromyalgia physically and mentally impacted his ability to perform his specific occupation. The Court acknowledges there is no bright-line rule that bound Hartford to arrange an in-person psychiatric or physical examination of plaintiff in this case. However, when, as here, the claims administrator has reserved the right to conduct an independent medical examination, plaintiff's credibility is a key factor in the disability determination, mental illness is present, fibromyalgia is the physical condition at issue, and the record shows that many unanswered questions

43

remain concerning plaintiff's medical condition and functional limitations, the decision to forego an in-person medical examination does not reflect deliberative, principled reasoning.

In view of the above, the Court finds Hartford acted arbitrarily and capriciously when it denied plaintiff's claim for LTD benefits without conducting in-person medical examinations to evaluate the effects of plaintiff's physical and mental symptoms on his ability to work. In cases such as this, courts may either award benefits to the claimant or remand the matter to the plan administrator for further proceedings. *Elliott*, 473 F.3d at 621. The Sixth Circuit has found that where the "'problem is with the integrity of [the plan's] decision-making process,' rather than "that [a claimant] was denied benefits to which he was clearly entitled,'" the appropriate remedy generally is a remand to the plan. *Id.* at 622.

In this case, the record does not demonstrate that plaintiff is clearly entitled to benefits. Instead, the issues lie with the decision-making process itself and the Plan administrator's failure to adequately develop the record before making its decision on plaintiff's claim for benefits. Thus, a remand to Hartford for further administrative proceedings, including in-person psychiatric and physical medical examinations, is the proper remedy.

**IT IS THEREFORE RECOMMENDED THAT:**

1. Plaintiff's motion for judgment on the administrative record (Doc. 16) be **GRANTED** and this matter be **REMANDED** to Hartford for further administrative proceedings on plaintiff's application for long-term disability benefits.

2. Hartford's motion for judgment on the administrative record (Doc. 15) be **DENIED**.

Date: 5/13/14

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DAVID R. CAUDILL,                                    Civil Action No. 1:13-cv-017
    Plaintiff,                               Weber, J.
                                                     Litkovitz, M.J.


    vs.

THE HARTFORD LIFE AND
ACCIDENT INSURANCE CO.,
    Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).